Judge BAKER
delivered the opinion of the Court.
At a general court-martial composed of military judge alone, Appellant was convicted, contrary to his pleas, of absence without leave, disobedience of a superior commissioned officer, failure to obey a lawful order, fleeing apprehension, assault upon a military policeman in the execution of his duties, and an offer of violence against a superior com *262 missioned officer in violation of Articles 86, 90, 92, 95, 128, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 886, 890, 892, 895, and 928 (2000), respectively. He was sentenced to confinement for ten months, total forfeiture of all pay and allowances, and dismissal. The convening authority approved the adjudged sentence and the Court of Criminal Appeals, in a per curiam opinion, affirmed. United States v. Collins, ARMY 9900937 (A.Ct.Crim.App. December 4, 2000). We reverse.
The critical question in this case is whether the military judge should have engaged in further inquiry into Appellant’s mental health in light of the nature of the original Rule for Courts-Martial 706 [hereinafter R.C.M.] evaluation and the examining physician’s apparent change of view during the trial.[1]
BACKGROUND
Appellant was a commissioned officer with 14 years of service at the time of the charged offenses. While serving in Saudi Arabia in 1997, Appellant notified his command of security concerns he had regarding the lack of chemical alarms, exceptions to policy for searching vehicles, as well as the lack of a secure water supply. Dissatisfied with the response he received from his command, Appellant went outside his chain of command and sent a letter to the Central Command Combatant Commander addressing these security practices and his concern for his troops.
Although various documents presented at Appellant’s court-martial “established,” according to the Government’s Brief, “that some of Appellant’s assertions” regarding the situation in Saudi Arabia “had some basis in fact,” he returned to Fort Bragg where he was denied his anticipated assignment as the brigade adjutant and instead received permanent change of station orders to American Samoa. While working as the training officer for National Guard soldiers in American Samoa, Appellant sent letters and emails to his military superiors regarding what he believed to be an ongoing conspiracy involving black-marketing and corruption. In light of Appellant’s actions, his commander sent him to Tripler Army Medical Center in Hawaii for a psychological evaluation. In August 1998, psychiatrists at Tripler diagnosed Appellant with delusional disorder.[2] The psychiatrists noted Appellant’s “thought content was of a non-bizarre delusional quality and reality testing seemed inconsistent” and his “insight, judgment, and impulse control are questionable.” Although the psychiatrists ultimately cleared Appellant to return to duty, they commented that “given his propensity for errors in judgment, command needs to determine whether [Appellant] can continue to be an asset for the Army.” ‘
During a subsequent examination at Tripler in September 1998, Appellant was diagnosed with adjustment disorder[3] instead of delusional disorder. In light of this evaluation, Appellant was placed on an “S-3 profile” for six months beginning on September 14, 1998. The S-3 profile required that Appellant be moved to a location where he could *263 receive close monitoring by an Army psychiatrist or psychologist with enough mental health resources to support weekly counseling or psychotherapy. On September 24, 1998, Appellant submitted a letter of resignation to his battalion commander, but the resignation was not immediately accepted. On October 22, 1998, Appellant received a poor performance report indicating that Appellant “definitely should not lead soldiers in combat” and evaluated his potential as “below center of mass do not retain.”
Because Appellant’s request for resignation had not yet been accepted, he began out-processing from the Army on his own volition. After completing most of his out-processing and requesting a permanent change of station, Appellant went to the airport in Hawaii en route to his home in New York. When confronted at the airport by a member of his unit, Appellant refused to return to base because he believed the “orders to be completely bogus” as he was no longer in the Army. After spending six months at his home, Appellant went to Fort Hamilton, New York, on May 19, 1999, to determine why he was not being paid. Appellant was informed that he was absent without leave and was returned to military control. Because the Army considered Appellant a deserter, he was sent to the Personnel Control Facility at Fort Knox, Kentucky.
While at this facility, Appellant relayed his conspiracy theories to the commander, Major (MAJ) Harris. Concerned with Appellant’s mental stability, MAJ Harris ordered Appellant to undergo a mental health evaluation. The results of this assessment indicated Appellant was “sound enough to face any administrative actions that [the facility] needed to do.” On June 28, 1999, MAJ Harris ordered Appellant to have another examination in the form of a R.C.M. 706 sanity board conducted by Colonel (COL) Richmond. Appellant, however, ignored the order because he believed it to be “an illegal immoral [sic] order.”
Upon learning of Appellant’s refusal to go to the evaluation, MAJ Harris confronted Appellant. At the time of this confrontation, Appellant was watching television and playing pool. When MAJ Harris ordered Appellant to give him the pool cue, Appellant jumped to his feet and made threats against MAJ Harris. Prior to being subdued, Appellant threatened MAJ Harris with the pool cue, ran away from MAJ Harris and four military policemen, and swung the pool cue at a military policeman. Appellant was subsequently apprehended by military police.
Later that day at Appellant’s jail cell, COL Richmond conducted Appellant’s one person sanity board that had originally been scheduled for earlier that morning. COL Richmond, the Chief of Behavioral Medicine at Ireland Army Community Hospital at Fort Knox, Kentucky, previously performed between 10 to 15 sanity boards. After examining Appellant for two hours, COL Richmond diagnosed Appellant as having delusional disorder. COL Richmond did not review Appellant’s prior mental health records from Tripler Army Medical Center during this examination.
COL Richmond compiled the results of the sanity board later that day. In his written report, COL Richmond concluded that Appellant’s thought content contained “pervasive beliefs of probable delusional nature in the conspiratorial wrong doing [sic] of high ranking Army officials across many year's and several different units.” COL Richmond noted Appellant’s “delusions were not bizarre and could be seen as plausible if they were not so pervasive and resistant to any other interpretation.” Ultimately, COL Richmond concluded that Appellant was “fully capable of understanding the nature of the proceedings and to assist in his defense. His cognitive deficits appear to be limited only to areas of his delusional belief system.” Appellant was subsequently charged with two specifications of failure to obey a lawful order, desertion, disobedience of and disrespect to a superior commissioned officer, fleeing apprehension, two specifications of assault upon a military policeman in the execution of his duties, two specifications of wrongfully communicating a threat, and an offer of violence against a superior commissioned officer.
*264 Prior to trial, Appellant requested the appointment of Dr. Patrick Burba as a defense psychiatric expert. Due to financial reasons, including the convening authority’s approval of less than half of defense counsel’s requested funding for Dr. Burba’s assistance, the only help Dr. Burba provided the defense was a letter indicating he was “unable to determine whether [Appellant’s] mental disease rendered him unable to appreciate the nature, quality, or wrongfulness of his conduct.” Dr. Burba also noted that “many of [Appellant’s] actions and decisions during the time in question were at least moderately influenced by his delusional interpretation of events.” Notwithstanding these opinions, Dr. Burba determined Appellant “was able to clearly state the nature of the court-martial, the roles of defense and prosecution counsel, the charges against him, the[]potential sentence if found guilty, and the behavior expected of him during the court-martial.”
During trial, COL Richmond testified that Appellant’s ability to function normally was limited to areas that did not involve his delusional beliefs and that Appellant’s delusions would preclude him from performing military duties. When questioned whether Appellant’s offenses stemmed from his delusions, COL Richmond testified that an individual with a delusional disorder would “probably react consistently with their delusion.” COL Richmond further indicated that Appellant’s reaction to the commander of the Personnel Control Facility was consistent with his delusional disorder. “[H]is belief system at the time was that these were individuals who were hostile towards him, who were acting on behalf of an agency, the U.S. Army, of which he was no longer a member and over which they had no legitimate authority over him.”
Trial counsel asked COL Richmond, “[D]o you recall in your report saying that the accused was able to appreciate the nature and quality of the wrongfulness of his conduct for the 5 November charges?” COL Richmond responded, “I do recall that.” When asked why he said that, COL Richmond replied, “Because he told me that.” Tidal counsel also inquired of COL Richmond, “[W]ould your belief to [sic] be that the accused’s decisions and overall behavior during this period was basically-he understood the nature and quality of the wrongfulness of his conductf?]” COL Richmond answered, “I don’t believe he did.” Additionally, trial counsel asked COL Richmond, “Sir, would your—with your idea of what specific intent means, after evaluation of the accused, in your opinion, do you believe Captain Collins could have had the mental capacity to form the requisite specific intent to permanently remain away from his unit, his unit of original assignment?” COL Richmond responded, “I believe Captain Collins being a very intelligent man could have the specific intent to do just about anything, so to answer your question, yes, he could have.”
Following Appellant’s conviction and separation from the Army, he experienced legal difficulties in the state of New York. In light of these problems, Appellant underwent a psychiatric evaluation on November 6, 2000. This psychiatrist diagnosed Appellant with delusional disorder and opined that Appellant “has no insight into his illness and (his) judgment is poor.” Pursuant to this Court’s order, Appellant underwent a second sanity board composed of two psychiatrists on April 15, 2002. This sanity board noted that Appellant “is not presently suffering from a mental disease or defect rendering him unable to understand the nature of the proceedings against him or to cooperate in his defense.” The board also stated that Appellant “was competent to participate in appellate proceedings at the time of this evaluation.” He “had a firm grasp of the factual aspects of legal proceedings, and clearly understood the nature of the charges against him, the penalties imposed by his initial court-martial, and potential remedies available to him through the appellate process.”
The board continued by explaining, “These cognitive aspects of competency have never been at issue in [Appellant’s] case; rather, the concern is whether his delusions would render him unable to conduct or cooperate intelligently in his own defense. This would appear to have been the case when his delusions were active, leading him to withhold *265 information and opinions from his attorney and evaluators and to seek prosecution in order to gain a public forum to espouse his delusional beliefs.” However, according to the sanity board, Appellant “had been restored to competency last year by adequate treatment ... and was free of such delusions at the time of this evaluation.” Finally, the board concluded that, at the time of the offenses, Appellant had a delusional disorder and “was unable to appreciate the nature and quality or wrongfulness of his conduct. Whether or not he understood that technically his conduct appeared to be unlawful, he did not appreciate it was wrongful, but believed it to be necessary.”
DISCUSSION
Appellant contends trial defense counsel presented enough evidence during trial to raise doubts about Appellant’s mental competency. Appellant further suggests that his irrational and incoherent trial testimony, along with COL Richmond’s testimony contradicting the written sanity board report, triggered the military judge’s responsibility to conduct a second sanity board.
The Government maintains Appellant failed to establish sufficient doubt regarding his mental competency or mental responsibility. In support of this position, the Government relies on Appellant’s four previous mental health evaluations. Moreover, the Government argues that Appellant’s own trial defense counsel did not question Appellant’s competency since he made no objections or motions at trial. Therefore, according to the Government, Appellant did not create enough doubt about his mental competency or mental responsibility to require the judge to order another sanity board.
The arguments presented by the parties raise questions regarding Appellant’s capacity[4] to stand trial as well as his mental responsibility for the charged offenses. R.C.M. 909 addresses an accused’s capacity to stand trial: “No person may be brought to trial by court-martial if that person is presently suffering from a mental disease or defect rendering him or her mentally incompetent to the extent that he or she is unable to understand the nature of the proceedings against them or to conduct or cooperate intelligently in the defense of the case.” R.C.M. 909(a). Mental capacity is a question of fact. R.C.M. 909(e)(1). Mental capacity will be presumed unless the contrary is established by a preponderance of the evidence. R.C.M. 909(b), (e)(2).
Lack of mental responsibility is an affirmative defense that must be raised and proven by Appellant by clear and convincing evidence. See R.C.M. 916(k)(l)-(3)(a). See also United States v. Cosner, 35 M.J. 278, 280 (C.M.A.1992)(citing United States v. Ramsey, 28 M.J. 370, 371 n. 2 (C.M.A.1989)). An accused is presumed to be mentally responsible at the time of the alleged offenses until the accused establishes by clear and convincing evidence that he was not mentally responsible at the time of the alleged offenses. R.C.M. 916(k)(3)(A). “Clear and convincing evidence is that weight of proof which ‘produces in the mind of the factfinder a firm belief or conviction’ that the allegations in question are true.” United States v. Martin, 56 M.J. 97, 103 (C.A.A.F.2001) (citations omitted).
Although an accused bears the burden of introducing evidence to establish lack of mental responsibility, R.C.M. 706(a) provides,
If it appears to any commander who considers the disposition of charges, or to any investigating officer, trial counsel, defense counsel, military judge, or member that there is reason to believe that the accused lacked mental responsibility for any offense charged or lacks capacity to stand trial, that fact and the basis of the belief or observation shall be transmitted through appropriate channels to the officer authorized to order an inquiry into the mental *266 condition of the accused. The submission may be accompanied by an application for a mental examination under this rule.
The purpose of the R.C.M. 706 sanity board “is to determine if an accused ‘lacks capacity to stand trial’ or ‘lacked mental responsibility for any offense charged.’ ” United States v. Murphy, 50 M.J. 4, 12 (C.A.A.F.1998)(quoting R.C.M. 706). Although concerns emerged during trial regarding Appellant’s mental competency and mental responsibility, for the reasons expressed below, this case hinges on the military judge’s response to questions raised concerning Appellant’s mental responsibility.
A “military judge may order a mental examination of the accused regardless of any earlier determination by the convening authority.” R.C.M. 706(b). As a result, the military judge in Appellant’s case had the authority and the responsibility to determine whether a second sanity board needed to be convened in light of COL Richmond’s testimony at trial. See Drope v. Missouri, 420 U.S. 162, 180, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); see also Short v. Chambers, 33 M.J. 49, 52 (C.M.A.1991). The question of whether an additional psychiatric examination is “necessary rests within the discretion of the military judge and is reviewable only for abuse of discretion.” United States v. Carpenter, 37 M.J. 291, 298 (C.M.A.1993)(citing United States v. Frederick, 3 M.J. 230, 232-33 (C.M.A.1977)). Thus, we test a military judge’s decision whether to order additional inquiry into an accused’s mental responsibility for abuse of discretion. See United States v. Gray, 51 M.J. 1, 13 (C.A.A.F.1999).[5]
COL Richmond testified that after examining Appellant for two hours he diagnosed him with delusional disorder. He explained that delusional disorder is a severe mental disease or defect that is “different from other psychotic disorders in that the psychosis is limited to specific delusions as opposed to, you know, all aspects of life, and reality testing, the ability to determine fact from fiction, reality from unreality, is essentially maintained across a broad spectrum of other activities with the exception of the delusion beliefs.” COL Richmond further explained that he based his opinions regarding Appellant’s requisite intent with respect to the charged offenses “on my perception that his belief system at the time was that these individuals who were hostile towards him, who were acting on behalf of an agency, the U.S. Army, of which he was no longer a member and over which they had no legitimate authority over him.”
When asked whether Appellant’s testimony at trial changed his diagnosis, COL Richmond responded, “No, it has not.” But he also testified that Appellant could function pretty normally “in all the areas that are not involved in his delusional belief system.” (Emphasis added.) When asked on cross-examination, “28 June, would that same— would your belief to be that the accused’s decisions and overall behavior during this period was basically—he understood the nature and quality of the wrongfulness of his conduct as well, those days?” COL Richmond replied, “I don’t believe he did.” Nonetheless, when questioned whether Appellant “could have had the mental capacity to form the requisite specific intent to permanently remain away from his unit,” COL Richmond responded, “I believe Captain Collins being a very intelligent man could have the specific intent to do just about anything, so to answer your question, yes, he could have.”
At this point in the trial, the military judge had a responsibility to consider whether COL Richmond, the sole member of Appellant’s sanity board, had changed his diagnosis regarding Appellant’s mental responsibility and whether further inquiry was needed. For example, in United States v. Bray, 49 M.J. 300, 302 (C.A.A.F.1998), when testimony at trial raised the question of whether the appellant was responsible for his actions de *267 spite the mental responsibility findings previously made by a sanity board, the trial judge halted the proceedings and advised the appellant of the possibility of a mental responsibility defense. We believe the military judge should have done something more in this case as well.
As noted above, the Rules for Courts-Martial permit additional mental health inquiry at any point during a court-martial proceeding. Although this Court has no case law directly addressing a military judge’s responsibility to order additional inquiry when questions regarding an accused’s mental responsibility are raised during trial, such a process is consistent with the federal approach of addressing questions of competence that arise during trial.[6]
In this case, the military judge was aware of the following: COL Richmond, a defense witness, was the sole witness testifying about Appellant’s mental capacity and mental responsibility. COL Richmond’s testimony was based on his R.C.M. 706 sanity board evaluation of Appellant. This evaluation occurred on June 28 after Appellant’s arrest and confinement. The evaluation consisted of a two-hour interview at Appellant’s jail cell. The military judge was also aware Appellant had been referred for psychological evaluations on three prior occasions and that COL Richmond did not review these evaluations before Appellant’s R.C.M. 706 sanity board. COL Richmond also testified that his conclusion that Appellant could understand the wrongfulness of his actions was based on Appellant’s own belief that he understood the wrongfulness of his actions. It was in this testimonial context that COL Richmond appeared to contradict his own R.C.M. 706 conclusions when he was asked “would your belief to [sic] be that the accused’s decisions and overall behavior during this period was basically—he understood the nature and quality of the wrongfulness of his conduct” and stated in response “I don’t believe he did.”
This was not a tangential or supplementary question, but the central question of the mental responsibility inquiry. In the context presented, such a statement from the only doctor testifying to Appellant’s mental responsibility warranted further inquiry. Although this inquiry may, and perhaps should have come from defense counsel, the Rules for Courts-Martial are clear. Mental competence and responsibility are the duty of all trial principals. See R.C.M. 706(a). In the courtroom, however, the military judge is ultimately responsible for ensuring that R.C.M. 706 is followed. As a result, we conclude the military judge abused his discretion by not ordering further inquiry into Appellant’s mental responsibility at the point in the trial when COL Richmond appeared to change his testimony and conclusion. This conclusion is reinforced by COL Richmond’s earlier testimony regarding the scope of his evaluation of Appellant. He testified that he did not review Appellant’s mental health history, including repeated mental health evaluations ordered by the Army.[7] As a result, Appellant was prejudiced when his trial proceeded to conclusion without further and complete inquiry into his mental responsibility-
*268 DECISION
The decision of the United States Army Court of Criminal Appeals is reversed.[8] The findings and sentence are set aside, and the record of trial is returned to the Judge Advocate General of the Army. A rehearing is authorized.

. This Court granted review of the following issues:
I. WHETHER THE SANITY BOARD ORDERED BY THIS COURT HAS GENERATED NEW EVIDENCE NOT DISCOVERABLE BY DUE DILIGENCE AT THE TIME OF TRIAL, AND, IF SO, WHETHER THE NEW EVIDENCE, WHEN VIEWED IN THE LIGHT OF ALL OTHER PERTINENT EVIDENCE, WOULD HAVE PRODUCED A SUBSTANTIALLY MORE FAVORABLE RESULT FOR APPELLANT. SEE R.C.M. 1210(f).
II. WHETHER, IN THE ALTERNATIVE TO ISSUE I, AND IN LIGHT OF THE APPELLATE SANITY BOARD'S FINDINGS THAT APPELLANT WAS NOT COMPETENT TO STAND TRIAL, APPELLANT WAS SUBSTANTIALLY PREJUDICED WHEN THE MILITARY JUDGE FAILED TO ORDER SUA SPONTE A SECOND SANITY BOARD. SEE R.C.M. 909(d).

. "The essential feature of Delusional Disorder is the presence of one or more nonbizarre delusions that persist for at least one month[.]” Diagnostic and Statistical Manual of Mental Disorders 296 (4th ed.1994).

. "The essential feature of an Adjustment Disorder is the development of clinically significant emotional or behavioral symptoms in response to an identifiable psychosocial stressor or stressors." Id. at 623.

. The parties in their briefs and at oral argument framed their arguments in terms of competency and mental responsibility. We note that the Rules for Courts-Martial "use the term 'mental capacity’ to refer to what civilian courts call competency.” Captain Margaret A. McDevitt, Defense Counsel's Guide to Competency to Stand Trial, Army Law., 33, 33 (March 1988). For the purpose of this opinion and in light of counsel’s arguments, we use the terms interchangeably.

. "Legal error (i.e., an abuse of discretion) occurs if the findings of fact upon which he [the judge] predicates his ruling are not supported by the evidence of record; if incorrect legal principles were used by him in deciding this motion; or if his application of ’the correct legal principles to the facts of a particular case is clearly unreasonable.” United States v. Gray, 51 M.J. 1, 13 (C.A.A.F.1999)(quoting United States v. Williams, 37 M.J. 352, 356 (C.M.A.1993)).

. See Drope v. Missouri, 420 U.S. 162, 180, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975)("There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.’’); see also Walton v. Angelone, 321 F.3d 442, 459 (4th Cir.2003)("Even if a defendant is mentally competent at the beginning of the trial, the trial court must continually be alert for changes which would suggest that he is no longer competent. ”)(citing Drope, 420 U.S. at 180, 95 S.Ct. 896 ("We conclude that when considered together with the information available prior to trial and the testimony of petitioner’s wife at trial, the information concerning petitioner's suicide attempt created a sufficient doubt of his competence to stand trial to require further inquiry on the question.”)).

. Although the military judge’s decision must be evaluated based on what was known to him at the time of trial, the results of the second sanity board and the psychiatric evaluation conducted in New York both support the conclusion that the military judge in this case needed to inquire further into Appellant’s mental responsibility.

. In light of our decision, Appellant’s petition for new trial is denied as moot.